UNITED STATES of America,

v.

**Masoud KHAN, et al., Defendants.**

**No. CRIM.03–296–A.**

United States District Court,
E.D. Virginia.
Alexandria Division.

March 4, 2004.

---

Todd Stewart Baldwin, Baldwin Molina & Escoto, Barry Coburn, Meredith Ann Taylor, Coburn & Schertler, Washington, DC, for Defendants.

Gordon D. Kromberg, David H. Laufman, United States Attorney's Office, Alexandria, VA, for United States.

*MEMORANDUM OPINION*

BRINKEMA, District Judge.

This case came on for trial by the Court[1] beginning February 9, 2004 on an

---

1. The Government and all four defendants waived the right to trial by jury.

indictment against defendants Masoud Khan, Seifullah Chapman, Hammad Abdur–Raheem, and Caliph Basha Ibn Abdur–Raheem (hereinafter Caliph Basha). The indictment charged these four defendants, co-defendants who entered guilty pleas, and unnamed, unindicted co-conspirators with 32 counts. The superseding indictment alleged against these four defendants conspiracy (Count 1, 18 U.S.C. § 371), conspiracy to levy war against the United States (Count 2, 18 U.S.C. § 2384), conspiracy to provide material support to al-Qaeda (Count 3, 18 U.S.C. § 2339B), conspiracy to contribute services to the Taliban (Count 4, 50 U.S.C. § 1705), conspiracy to contribute material support to Lashkar–e–Taiba ("LET") (Count 5, 18 U.S.C. § 2339A), commencing an expedition against a friendly nation (Counts 9–10, 18 U.S.C. § 960), conspiracy to possess and use firearms in connection with a crime of violence (Count 11, 18 U.S.C. § 924(o)), receipt of ammunition with cause to believe a felony will be committed therewith (Counts 12–14, 18 U.S.C. § 924(b)), and use and possession of firearms in connection with a crime of violence (Counts 20–22, 24–27, 31–32, 18 U.S.C. § 924(c)).[2] Co-defendants Randall Royer, Ibrahim Al–Hamdi, Yong Kwon, Mohammed Aatique, Donald Surratt, and Mahmoud Hasan entered into plea agreements and pled guilty to various counts in the indictment.

The factual allegations in the indictment focus on the defendants' involvement in activities starting in January 2000 and continuing through June 2003, which the government maintained constituted preparation for violent jihad overseas against nations with whom the United States was at peace and providing material support to terrorist organizations. The indictment alleges that the preparations culminated in Khan and other co-conspirators attending a terrorist and jihad training camp after September 11, 2001, with the intent to proceed to Afghanistan and fight for the Taliban and Al–Qaeda against United States troops. The indictment further alleges that Royer and Al–Hamdi had participated in attacks on Indian forces in the disputed Kashmir region.

After the conclusion of the government's evidence, defendants moved for judgment of acquittal pursuant to Fed.R.Crim.P. 29. The motions of Khan, Chapman, and Hammad Abdur–Raheem were granted in part and denied in part, and various counts dismissed with prejudice as to these defendants, as detailed in our Order of February 20, 2004. The motion was granted in its entirety as to Caliph Basha, and all counts against him were dismissed with prejudice, because we found insufficient evidence to support conviction on any count, for the reasons stated in open court. At the conclusion of all the evidence, the defendants renewed their motions for judgment of acquittal as to the remaining counts. Those motions were denied.

This memorandum opinion explains the factual findings and legal conclusions that support our judgment that defendant Khan is guilty of Counts 1, 2, 4, 5, 11, 24, 25, and 27; defendant Chapman is guilty of Counts 1, 5, 11, 20, and 22, and defendant Abdur–Raheem is guilty of Counts 1, 5, and 11; and that these defendants are not guilty of the remaining counts.

### I. Procedural background—Motion to suppress

Before trial, defendant Chapman moved to suppress, pursuant to *Simmons v. Unit-*

---

**2.** Count 15, charging Chapman with making false official statements, was dismissed with prejudice by Order of January 16, 2004 because the motion to suppress the underlying statements was granted. Counts 6, 16, and 17 relate only to defendant Sabri Benkhala. The counts against Benkhala were severed for trial and are not discussed in this opinion.

*ed States,* 390 U.S. 377, 394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) and *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the use and derivative use of statements that his former counsel, Phillip Leiser, made during a pretrial suppression hearing. As explained in open court and discussed in more detail in this opinion, we suppressed direct use of Leiser's testimony, but allowed the use of evidence related to his statements, finding that the *Kastigar* derivative use doctrine did not apply, and that even if *Kastigar* did apply, that the government satisfied its burden to show that the evidence at issue was an inevitable discovery from an independent source.

## A. Background

After he was initially indicted, Chapman was arrested by authorities in Saudi Arabia, and was turned over to United States law enforcement agents. Chapman was then transported from Saudi Arabia to the Eastern District of Virginia by airplane. Count 15 of a superseding indictment alleges that during this flight Chapman made false statements, in violation of 18 U.S.C. § 1001(a), that he had not attended or seen LET or jihad training camps.

Chapman moved to suppress any statements made to law enforcement after his arrest in Saudi Arabia, on the grounds that they were in violation of his Sixth Amendment right to counsel. *See Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Specifically, Chapman argued that his statements must be suppressed because he had retained Leiser as counsel, the government was aware that Leiser had been retained, and Chapman desired his attorney's assistance in dealing with interrogation. The government responded to the motion by arguing that Chapman had told FBI agents aboard the plane that Leiser was no longer his attorney, he did not know whether an attorney had been appointed for him, and

that the FBI agents relied on these statements in continuing to question Chapman.

To resolve the disputed facts regarding whether Leiser was Chapman's attorney at the time of questioning, the Court held an evidentiary hearing. Chapman's present counsel, Lisa Kemler, called Leiser as a witness to testify as to the existence and scope of the attorney-client relationship between Chapman and Leiser. Leiser's testimony detailed his communications with Chapman regarding FBI Special Agent Wade Ammerman's request for an interview with Chapman and Leiser's efforts to arrange such an interview. On cross-examination, Assistant U.S. Attorney Gordon Kromberg asked:

Q. In your communications with Mr. Chapman, did he tell you that he needed representation regarding his attendance at a Lashkar–e–Taiba training camp in Pakistan?

A. No.

Q. About his travel to Pakistan?

A. No.

Q. About violations of the Neutrality Act for going to Pakistan?

A. No.

Q. Material to support terrorism?

A. No.

Q. For firearms charges?

A. No.

THE COURT: Mr. Kromberg, why are these questions relevant?

MR. KROMBERG: I think they're relevant, Your Honor, because if the suggestion is that Mr. Chapman had retained this attorney for the purposes of this case, I would think that Mr. Chapman would have said what some of the problems that he—some of the liability he was facing. He may not have known the particular statutes involved, but maybe he did, because

at this point in time, Mr. Royer was talking to his lawyers about these very issues.

On redirect, Kemler asked:

Q. Mr. Leiser, what was Mr. Chapman's understanding of what they wanted to talk to him about?

A. Mr. Chapman had indicated that he had regularly attended the Islamic Institute, I believe, here in Northern Virginia, that he had met somebody there who had asked him to make a purchase of some video equipment which he understood was later used on some type of remote-controlled, like, model airplane, and that his understanding was that Agent Ammerman wanted to discuss that, that purchase with him.

While Leiser was reviewing his notes, the Court noted:

Ms. Kemler, I didn't probe this with you, but obviously, by asking these questions on behalf of Mr. Chapman, there's been a waiver to some degree of the attorney-client privilege.

MS. KEMLER: Yes. We were aware of that, Your Honor.

Kemler then followed up:

Q. Okay. After looking at your notes, do you recall any additional matters that were discussed about what the scope of the interview would be?

A. No, that was it. Mr. Chapman had informed me about the prior questioning in '99 or 2000, that it concerned this paintball exercises that he engaged in with some friends, but that he believed that this particular questioning concerned a purchase of the video equipment for a person named Khalid, Khalid Singh.

Chapman then sought to suppress at trial the direct use of Leiser's testimony regarding the purchase of video equipment under the holding in *Simmons*, and argued that records documenting the purchase of video equipment and communications regarding the purchase must also be suppressed as fruits of the suppression hearing testimony pursuant to *Kastigar*.

*B. Discussion*

■ Chapman relies on *Simmons*, which held that a defendant may testify in a pretrial suppression hearing without surrendering his Fifth Amendment right not to be forced to incriminate himself. In *Simmons*, the defendant testified at a suppression hearing to establish he had standing to bring a Fourth Amendment challenge to a search. The state then sought to admit the defendant's suppression hearing testimony at trial to link him to the evidence. The Supreme Court ruled that the defendant's testimony at the suppression hearing did not waive his Fifth Amendment right not to have his testimony used against him at trial, reasoning that it is "intolerable that one constitutional right should have to be surrendered in order to assert another." *Id.* at 394, 88 S.Ct. 967. Here, Chapman faced a similar predicament, as he was required to waive his attorney-client privilege, derived from the Fifth and Sixth Amendments, in order to assert his rights under the Fifth and Sixth Amendments to suppress statements made without benefit of counsel.

The government argues that Leiser's testimony about the subject matter of his discussions with Chapman was a voluntary disclosure inconsistent with the confidential attorney-client relationship which waives the privilege. *See In re Grand Jury Subpoena*, 204 F.3d 516, 521 (4th Cir.2000); *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir.1982). The government also argues that *Simmons* is inapplicable here, because the attorney-client privilege is a common law privilege and not a constitutional right. The gov-

ernment found authority for its arguments in the Eleventh Circuit's decision in *In re Federal Grand Jury Proceedings (Cohen)*, 975 F.2d 1488 (11th Cir.1992), which held that an attorney's testimony at a suppression hearing waived the attorney-client privilege, rejecting the *Simmons* analogy.

■ We agree with Chapman that *Simmons* is an appropriate analogy, and therefore applies to the facts of this case. Although the attorney-client privilege is a common law right, when, as here, it is invoked by a criminal defendant to protect the confidentiality of his communication with his attorney regarding a law enforcement investigation, the privilege must be considered an extension of the Fifth Amendment right against self-incrimination and the Sixth Amendment right to effective assistance of counsel. *See Swidler & Berlin v. United States*, 524 U.S. 399, 407, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998); *Bittaker v. Woodford*, 331 F.3d 715, 723 n. 9 (9th Cir.2003) (citing cases). On the facts of this case, Chapman faced a Hobson's choice similar to that of the defendant in *Simmons*, in which Chapman was required to waive the privilege in order to effectively assert his Fifth and Sixth Amendment rights. Because the government, in its opposition to the motion to suppress and on cross-examination, suggested that Leiser was not representing Chapman in relation to the criminal charges about which Chapman was questioned on the flight, defendant's counsel had to elicit testimony about the subject matter of the representation to assert fully Chapman's right to counsel.

We are not persuaded by the Eleventh Circuit's conclusion in *In re Federal Grand Jury Proceedings (Cohen)* that *Simmons* does not apply to a waiver of the attorney-client privilege in a suppression hearing. To reach its conclusion, the Eleventh Circuit questioned the continuing vitality of *Simmons*, and found that *Sim-*

*mons* had never been extended to situations involving the exclusion of prior testimony when competing rights, whether constitutional or statutory, are at issue. The Supreme Court has repeatedly reaffirmed *Simmons, see, e.g., United States v. Salvucci*, 448 U.S. 83, 89, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), and *Simmons* remains good law in the Fourth Circuit, *see, e.g., Oken v. Corcoran*, 220 F.3d 259, 267 (4th Cir.2000). Further, the reasoning of *Simmons* has been extended to bar the government's use at trial of a defendant's prior statements when competing rights are at issue. *See United States v. Branker*, 418 F.2d 378 (2d Cir.1969) (defendant's testimony supporting his application for appointed counsel not admissible at trial). Finally, the Eleventh Circuit's decision is in tension with the Fifth Circuit's decision in *In re United States of America*, 878 F.2d 153 (5th Cir.1989). In that case, defendants sought to take a Rule 15 deposition of an attorney to establish the existence of an attorney-client relationship, to show that conversations between the defendants and that attorney were privileged, and therefore could not be used by the government. The defendants sought to take the deposition *ex parte* because they were concerned that the participation of government counsel in the deposition would constitute a waiver of the privilege. The Court dismissed this concern, rejecting the contention that calling the attorney to testify at a hearing on a motion to dismiss or suppress would waive the privilege:

> "We are aware of no authority that would support such a waiver, and neither the district court nor the [defendants] (here or below) have cited any authority which assertedly supports it. . . . [I]t would appear that use of the attorney's testimony by the [defendants] at the hearing on their motion to dismiss the indictment or to suppress, to estab-

lish that the indictment, or the evidence to be suppressed, resulted from a government-induced breach of the attorney-client privilege would not result in a waiver thereof. Seeking to thus enforce the privilege hardly seems to constitute a waiver of it." 878 F.2d at 158. We find that the facts described in this case are closely analogous to the issue before us.

We also find an appropriate analogy to the instant case in the Ninth Circuit's recent decision in *Bittaker*, 331 F.3d at 723. In *Bittaker*, the Ninth Circuit, sitting *en banc*, applied *Simmons* to hold that a habeas petitioner's waiver of the attorney-client privilege to bring claims of ineffective assistance of counsel was a limited waiver for purposes of the habeas proceedings only, and did not waive the privilege for any subsequent retrial. In reaching this conclusion, the court assumed that the attorney-client privilege had a constitutional dimension in the criminal context, and found that the waiver of the privilege in the habeas proceeding was "voluntary ... only because there is no other means of protecting legal rights.... The scope of required disclosure should not be so broad as to effectively eliminate any incentive to vindicate [one's] constitutional right[s]." 331 F.3d at 723 (internal citations and quotations omitted). The Ninth Circuit upheld the protective order entered by the district court that limited the use of privileged material disclosed in the habeas proceeding in any future retrial. *Id.* at 728.

▮ Accordingly, we prohibited the government from introducing Leiser's testimony at trial. After Leiser testified at the suppression hearing, the government discovered documentary evidence that Chapman had helped Pal Singh in Coventry, England purchase equipment from www.wirelessvideocameras.com. Chapman moved that this evidence be suppressed as fruits of Leiser's testimony, arguing that *Simmons* prohibits both use and derivative use of suppression hearing testimony.[3] *See United States v. Boruff*, 870 F.2d 316, 318–19 (5th Cir.1989). As to the derivative use of Leiser's testimony, Chapman argued that *Kastigar* requires the government to show that the discovery of evidence about wireless video equipment and Khalid Singh after Leiser's testimony was not tainted by that privileged testimony.

The government responded that *Kastigar* applies only to compelled testimony and does not apply to evidence derived from privileged communications. *See United States v. Squillacote*, 221 F.3d 542 (2000); *Nickel v. Hannigan*, 97 F.3d 403, 409 (10th Cir.1996). The government further argued that even if *Kastigar* did apply, the bank records that documented the purchase had been subpoenaed and received by agents before Leiser testified. The agent charged with reviewing the records had not been through them, but had been tasked to do so before trial. Lastly, the purchase of the electronic equipment was sufficiently clear from the bank records that it would have triggered further investigation.

We agree with the government that *Kastigar* does not apply to the facts of this case. In *Squillacote*, the Fourth Circuit held that *Kastigar*'s protections against derivative use are triggered by the govern-

---

**3.** Chapman also urged that the evidence be suppressed as a sanction against the government for failure to timely disclose that the FBI had intercepted e-mail communications between Chapman and Leiser demonstrating their attorney-client relationship, because timely disclosure would have made Leiser's suppression hearing testimony unnecessary. We rejected this argument because we found that the government's disclosure of the information complied with the discovery orders in this case, and that there is no evidence of bad faith or deliberate concealment.

ment's efforts to compel testimony over assertions of constitutional privilege, not the mere existence of evidence that may be protected by a privilege. 221 F.3d at 559. Although the facts of *Squillacote* involved the non-constitutional psychotherapist-patient privilege, the Fourth Circuit relied on the reasoning of the Tenth Circuit in *Nickel,* which concerned the attorney-client privilege of a criminal defendant. *Nickel* held that even if the testimony of a defendant's attorney should have been suppressed on the basis of the attorney-client privilege, the "fruit of the poisonous tree" doctrine does not apply to suppress evidence derived from the attorney's testimony. 97 F.3d at 409. Based on these authorities, we found that a *Kastigar* hearing was not necessary in this case.

■ Nonetheless, in an abundance of caution, we required the government to submit information detailing how it came to discover the details surrounding Chapman's purchase of wireless video equipment. The government responded that FBI agents reviewed Chapman's banking records, which had been subpoenaed previously, in preparation for trial. On or about January 9, 2004, agents identified a $986 purchase from www.wirelessvideo-cameras.com, and contacted that vendor to obtain additional evidence regarding the purchase. The vendor's records led the agents to Pal Singh.

*Kastigar* imposes on the government "the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony," 406 U.S. at 460, 92 S.Ct. 1653. Moreover, the government may not use compelled testimony to provide a lead that alters the course of the investigation. *See United States v. Harris,* 973 F.2d 333 (4th Cir.1992).

The facts in this record led us to find that the discovery of the wireless video purchase was wholly independent from Leiser's testimony. First, although the purchase was not identified in the bank records until January 9, 2004, after Leiser's testimony in December 2003, the records themselves were subpoenaed and in the possession of the government before Leiser's testimony. Second, the review of financial records in preparation for trial is a routine investigative tool, and we did not find that such a routine task would have been ignored but for Leiser's testimony. Finally, any agent would have immediately recognized the significance of the wireless video purchase, even without the lead provided by Leiser. The $986 purchase was by far the largest purchase in Chapman's records for the relevant month. Well before Leiser testified, the government had flagged as significant the fact that LET had used model airplanes, and agents already knew that Khan had purchased model airplane equipment with wireless video capacity. Indeed, Khan's purchase of model airplane equipment was alleged in the indictment as overt act # 83 in furtherance of several conspiracy counts. For these reasons, we found that even if the derivative use of Leiser's statements were prohibited by *Simmons* and *Kastigar,* the government established that the discovery of Chapman's wireless video purchase was independent, and not derived from that testimony.

## II. Findings of Fact

The majority of the facts in this case are not in dispute. Rather, the parties differ dramatically as to the interpretation to be placed on the facts. More specifically, the government contends that the three defendants on trial shared extremist views of Islam with the others indicted in this case, which led them to prepare for violent physical jihad themselves or to prepare others for violent jihad directed at nations with whom the United States is at peace, and ultimately, at the United States.

802

Defendant Chapman counters that he is a moderate Muslim with no interest in violent jihad against any country. He argues that his possession of weapons was lawful and for legitimate recreational purposes, that he played paintball with other named co-conspirators for physical exercise, that he did not know the LET camp he and others visited in Pakistan trained persons for violent jihad, and that he had no intention himself of fighting India or any other nation and no intention of helping others engage in such fighting. Defendant Abdur–Raheem similarly argues that his possession of firearms, his training co-conspirators about the safety and maintenance of their firearms, and his participation in paintball were for purely recreational purposes. He disavows knowing the intention of other paintball players to use the game as a preparation for violent jihad. He also argues that he was never a part of any of the conspiracies. Defendant Khan argues that he was not a part of the paintball group and that his trip to Pakistan was for the purpose of settling a family legal problem. He argues that the time he spent at the LET camp was purely recreational and he disavows any intention to go to Afghanistan to fight on behalf of the Taliban against the United States.

The evidence as to each defendant's involvement in each count is entitled to separate evaluation and the evidence supporting or undercutting each count must be considered on its own merits. Due to the sharp conflict over the knowledge and intention of the defendants, the Court necessarily must determine what each defendant knew and intended. Because we cannot look directly into the human brain or heart to make such a determination, the Court has relied on evidence of what the defendant has said or done, or failed to say or do, during and around the time period at issue in the indictment, which runs from January 1, 2000 through June 2003. The Court has also used both the direct and circumstantial evidence that it found to be reliable and drawn from that evidence reasonable conclusions justified in light of common sense. Lastly, the Court has judged the credibility of the witnesses who have testified. The evaluation of witness credibility in this case has been based in what the witness said; his demeanor while on the witness stand; the extent to which the testimony has been substantiated or contradicted by other evidence in the case, including the testimony of other witnesses; the degree to which the witness may have been impeached; any relation the witness may have to either side of the case; and any motive, such as a plea bargain, to testify either truthfully or falsely. Two defendants, Abdur–Raheem and Chapman, testified. The credibility of their testimony has been evaluated using the same principles that apply to any other witness. Defendant Khan exercised his Fifth Amendment right not to testify and no inference has been drawn from that silence. Based on this evaluation, we have found the following facts.

### A. How the defendants met

All the defendants on trial and their co-conspirators are Muslim, who met each other at different times. Abdur–Raheem met co-defendants Caliph Basha and Surratt and witness Maurice McCoy at Prince George's Community College around 1996. They started a Muslim student group there. In 1998 Abdur–Raheem moved to Northern Virginia and transferred to the Northern Virginia Community College ("NOVA"). Caliph Basha introduced Abdur–Raheem to Nabil Gharbieh some time before 2000. Gharbieh was a devout Muslim who along with Sheikh Jaafar and Ali Al–Timimi set up the Dar al-Arqam Center ("the Center") in Falls Church, VA. Gharbieh testified that the purpose for establishing the Center was to provide in-

struction on Islam in English, rather than Arabic, to improve local Muslims' understanding of their religion. Kwon, a Korean convert to Islam, met Al–Timimi and Royer in 1997 at a convention. Kwon met Aatique and Omar Khan, the brother of defendant Masoud Khan, while they were students at Virginia Tech in the late 1990s. Kwon often stayed at the Khan residence and became a close friend of defendant Masoud Khan. Kwon met Abdur–Raheem, Caliph Basha, Surratt, Al–Hamdi and Gharbieh at the Center. He met Chapman through a friend before going to the Center. All the defendants knew each other by the dates of the conspiracy.

### B. Paintball

It is uncontested that Nabil Gharbieh came up with the idea of playing paintball. He and Kwon both testified that in early January 2000 after dining with Al–Timimi, the two of them discussed setting up a paintball group as a way of doing jihad. Jihad literally means a struggle, which may range from exercising self-discipline, such as controlling one's appetite, to violent combat against perceived enemies of Islam. Gharbieh, who the Court found to be a very credible witness, testified clearly that in early 2000, the war in Chechnya was a very "hot topic" among Muslims and was regularly discussed in the mosques and on Arabic satellite television. When he and Kwon discussed setting up paintball as a vehicle for jihad, their intention was to prepare for physical jihad in the sense of physical preparation for possible combat. They relied upon the Koran's teaching that Muslims must be proficient in the use of the crossbow, horseback riding, and swimming for their view about the requirement of being physically prepared for combat.

Kwon and Gharbieh spoke to other Muslim men they knew from the Center about paintball. These people included defendants Abdur–Raheem and Chapman and co-conspirators Royer, Al–Hamdi, Aatique, and Caliph Basha. Chapman was not as regular an attendee at the Center as the others, but was well enough known to be invited to join. Khan, although well-known to Kwon, who had lived at the Khan home, was not a member of the paintball group.

Kwon made the initial purchases of the paintball equipment in the spring of 2000. By early summer the paintball games were a regular occurrence every other weekend. Initially played at public courses, the games were moved to private farm land in Spotsylvania County. Because Abdur–Raheem, Chapman, and Surratt had prior military experience, they were asked to lead the paintball teams and train the players to improve their game. Although the defendants have tried to portray the paintball exercises as innocent fun, the Court concludes that for the defendants and their co-conspirators, these games were viewed as not just an opportunity for outdoor exercise, fellowship, and an opportunity to improve self-defense skills, but also as preparation for real combat. The Court bases this conclusion on the following facts.

The witnesses consistently testified that violent jihad in Chechnya was actively discussed by the paintballers. The players shared videotapes of war and their paintball Website, which was password protected, was used to disseminate information about jihad. To improve their paintball skills, the group asked those with military experience, Surratt, Abdur–Raheem, and Chapman, to lead drills. Both Abdur–Raheem and Chapman testified that they did lead these exercises.

In September 2000, Chapman was visited by two FBI agents at his job site on the NOVA campus and asked about the paintball activity. Chapman testified that he told the agents all about the activity and

that this candor demonstrates his understanding that the games were not violating any laws. That argument is undercut by testimony of other witnesses who testified that after Chapman was interviewed, the paintball activity continued but with heightened secrecy. For example, Aatique joined the paintball group in the summer of 2000 after being invited to join. He testified that in the second season [4], the games were more secretive. New players had to have two or three sponsors and were told not to speak to the police if questioned about paintball.

The defendants have tried to downplay the secrecy and the seriousness of the games. However, an outside observer of the games, Yusuf Wells, provided extremely reliable evidence that corroborates Aatique's testimony. Wells, who was a fund raiser for the Benevolence International Foundation, an Islamic relief organization, visited Gharbieh in Northern Virginia over the April 14–15, 2001 weekend. On April 15, 2001, Gharbieh brought him to a paintball game. Part of Wells' job involved writing reports about his fund raising trips. In his April 15, 2001 report he states:

> I was taken on a trip to the woods where a group of twenty brothers get together to play Paintball. It is a very secret and elite group and as I understand it, it is an honor to be invited to come. The brothers are fully geared up in camouflage fatigues, facemasks, and state of the art paintball weaponry. They call it "training" and are very serious about it. I knew at least 4 or 5 of them were ex U.S. military, the rest varied.
>
> Most all of them young men between the ages of 17–35. I was asked by the amir of the group to give a talk after Thuhr prayer. I spoke about seeing the conditions of Muslims overseas while with BIF, and how the fire of Islam is still very much alive in the hearts of the people even in the midst of extreme oppression. I also stressed the idea of being balanced. That we should not just be jihadis and perfect our fighting skills, but we should also work to perfect our character and strengthen our knowledge of Islam. I also said that Muslims are not just book reading cowards either, and that they should be commended for forming such a group.
>
> Many were confused as to why I had been "trusted" to join the group so quickly, but were comforted after my brief talk. Some offered to help me get presentations on their respective localities.

(G Ex. 7C1 at 5–6) (emphasis in original).

The defendants have tried to discredit this report by arguing that Wells was not accurate in his reporting and only trying to impress his supervisor. We find no support for that argument.

Wells' observation about the secretiveness with which paintball was played is corroborated by Gharbieh's testimony describing the rule restricting new players to those known by the group, and the need for secrecy because outsiders might view them as terrorists. Andre Thompson testified that Surratt brought him to the paintball group in the summer of 2000 and told him that to continue to play he had to follow three rules: don't tell anyone, don't bring anyone, and take the Fifth if questioned by the police. Thompson was surprised by the rules, but Surratt explained that the rules were needed because Muslims were under surveillance. Surratt also

---

4. Paintball was not played during the winter, both because of cold weather and because it was dangerous to wear camouflage in the woods during hunting season. The first paintball season ended in late October 2000. The second season began in spring 2001 and ended as of September 11, 2001.

said someone would call him. Kwon called Thompson and asked him if he knew the rules, and after that Thompson became a regular player.

Wells' observations about the intensity of the players and some players' views about paintball preparing them for jihad are corroborated by the testimony of numerous witnesses. Thompson testified that the fighting in Chechnya was discussed on the paintball field constantly. Some players such as Al–Hamdi openly discussed wanting to go to Chechnya to fight. Royer encouraged Al–Hamdi, and also described paintball as a means for helping them prepare to fight. Thompson described Chapman as saying that paintball would enable them to fight but was not sufficient to qualify a person to fight overseas. Thompson also testified that Chapman once described paintball as a stepping stone to real training, and Abdur–Raheem said similar things about paintball—that it had application to real fighting but was not equivalent to it.

Thompson also described military-type drills conducted by Chapman, Abdur–Raheem, and Surratt, all of whom had previous military experience. One time Chapman e-mailed pages from a military training manual to the players, then asked if they had memorized the pages. Abdur–Raheem and Chapman taught flanking maneuvers and land navigation. Warmups included military-like calisthenics including duck walks and push-ups, with physical punishment such as pushing a car in neutral for those coming late. Chapman enforced the punishment.

Surratt's testimony echoed Thompson's description of the games and supported Gharbieh's opinion that the games became more serious over time. When Chapman took over training during the summer of 2000, it became intense with Chapman telling the group "we're going to learn to fight." Surratt described Chapman as enforcing discipline on late comers. Surratt also admitted that he provided military training out of his boot camp book. He taught assault and retreat and defend techniques, formations and hand signals. By the spring of 2001, Surratt had become concerned about the legality of what they were doing because of the cliquishness of the group, and his knowledge that Royer and Al–Hamdi had attended jihad training camps in Pakistan. He was also concerned about some of the players constant talk about really wanting to implement their training overseas. Surratt discussed his concern with Abdur–Raheem who said there was nothing illegal about their activities and that they were doing nothing more than the Michigan militia. After that discussion, he and Abdur–Raheem decided to continue playing paintball—they felt if someone went overseas and got in trouble that was not their problem.

Aatique testified that he understood a purpose of the paintball games was to get military training for jihad and that Kwon and Al–Hamdi specifically told him they were training for jihad. He learned on the paintball field that Al–Hamdi planned to go to a Pakistan camp to fight in Kashmir and ultimately die shaheed.[5] Other paint-

---

**5.** According to the defendant's expert on Islam, Mohammad Arafa, to die shaheed means to die in a state of jihad, which does not necessarily mean combat because jihad includes all struggles, not just violent ones. However, in Al–Hamdi's testimony he described shaheed as dying in combat. The government introduced documentary evidence extolling death while battling on behalf of Islam as the highest form of shaheed, resulting in greater rewards, including rewards for family members. This view of shaheed undercuts Chapman's argument that he would not have encouraged a marriage between Al–Hamdi and Chapman's sister-in-law had Chapman known that Al–Hamdi planned to die shaheed.

ballers were present at this discussion. Aatique testified that when Al–Hamdi returned from Pakistan in September 2000, the players were surprised to see him alive. Al–Hamdi described his camp experiences and afterwards continued to play paintball. Every witness who testified on the subject described Al–Hamdi as an improved paintball player after he returned and he even served with Chapman as team captain.

Aatique also described how Abdur–Raheem during a training drill once shouted "helicopter." The players did not know how to respond. After shooting in the direction of the aircraft, they were told by Abdur–Raheem why that response was incorrect. Abdur–Raheem testified about this incident and admitted that he gave the command, but argued that it was intended as a joke, knowing the players would be confused. Even though Aatique confirmed that Abdur–Raheem and Surratt laughed about the incident, he also testified that he did not view the exercise as a joke and that when another player asked how they should respond to a helicopter attack, Abdur–Raheem explained what they should do quite seriously.

As further evidence of the true nature of the paintball games, we rely on the testimony of FBI Special Agent John Wyman about his debriefing Caliph Basha on March 23, 2003. In his first interview, Caliph Basha told the agents that the paintball was for fun, not military training, that Surratt and Abdur–Raheem led the teams, and that although Chechnya was often discussed, no one spoke about going overseas to fight or tried to get him to fight. Thirty minutes later, after agents challenged Caliph Basha about his truthfulness, he changed his story. He stated that paintball was intended as training for jihad, so that the men could be prepared if something happened.

The defendants argue that their involvement in paintball was completely innocent. They called Jessica Sparks, an expert on the game of paintball, who explained that all the military-type tactics are just part of the game. Sparks described the physical rigors of the game, the need to do warm-ups, and the regular use of drills such as flanking. The Court found all of Sparks' testimony credible. However, it did not address the real issue of the defendants' intent in engaging in these activities. Moreover, on rebuttal, the government called Major David Laden, responsible for basic training at the United States Marine Corps base at Quantico, Virginia, who confirmed that starting in 1999, the Marine Corps used paintball as part of its training program. Consistent with how Abdur–Raheem and Chapman described paintball to the co-conspirators, Laden explained the benefits of paintball as a stepping stone to further military training. According to Laden, paintball is not the equivalent of real combat, but it simulates aspects of real combat, such as learning how to move under fire. It also provides instantaneous feedback when a player makes a mistake, because he feels the sting of being hit by a paintball.

Based on the totality of the evidence, the Court finds that the paintball exercises were an integral part of many of the conspiracies charged in this case, as they were treated as part of training for violent jihad.

### C. Lashkar–e–Taiba

As with their participation in paintball, the issue as to what the defendants knew and intended with respect to their involvement with Lashkar–e–Taiba is also disputed.

Markaz Dawa Wa'al Irshad was founded to organize Pakistani Muslims to conduct violent jihad against Russians in Afghanistan. Eventually it divided into separate

sections. The military wing, known in this case as Lashkar–e–Taiba ("LET"), during the 1999–2003 period was primarily focused on defeating India's influence in Kashmir (G Ex. 1D49). Through the numerous Taiba Bulletins, or LET newsletters, entered into evidence, it is clear that the LET was engaged in violent actions against Indian forces. For example, on April 23, 2000, the Taiba Bulletin announced in part:

The mujahideen continued "Operation Ghauri" in Kupawara, in the village of Gung in the LOLAB area. They attached a mine under a bridge and took up positions around it. As an Indian military bus convoy passed over it, the mujahideen detonated the mine by remote control; the explosion sent one bus over the side of the bridge and into a deep trench, destroying it. The mujahideen then opened fire with assault rifles on the remaining buses. Several Indian soldiers died . . . .

In the capitol of Occupied Kashmir, Lashkar–e–Taiba's Fidai Brigade launched their third attack in recent days on the Indian "Nogam Brigade" Headquarters, located in Kupwara district. Three mujahideen entered the camp and immediately killed the two guards on duty. Then they fired two disposable shoulder-launched rockets at the main building, destroying a major part of it. One mujahid positioned himself at the gate to stand watch, while the remaining two entered the partially demolished main building and began shooting Indian soldiers. This caused many Indian soldiers to flee in panic from the building towards the camp's gate. The mujahid stationed at the gate subsequently opened fire on them, resulting in a scene of fearful shouting, crying and shrieking. This furious battle continued for forty-five minutes, resulting in the deaths of eleven Indian soldiers and the serious injury of six. Before tactically retreating from the military camp, the three mujahideen set fire to an Indian military oil tanker, resulting in the complete wastage of its oil.

(G Ex. 1D3). The Taiba Bulletins contain a footer with the following contact information:

TAIBA BULLETIN is an official publication of

MUJAHIDEEN LASHKAR–E–TAIBA

5 Chamberlane Road, Lahore—Pakistan

Tel: (92–42) 741–2565

Fax: (92042) 741–1242

Http://www.dawacenter.com/

Email: markazdawa@hotmail.com

Requests for information about the jihad in Kashmir are welcome.

This phone number was listed on a paper seized in a search of Royer's home (G Ex. 1A9, Stip. 8–2) and a business card seized from Al–Hamdi's home (G Ex. 3A12, Stip. 8–13). Other Taiba Bulletins discussed possible jihad actions against Russia (G Ex. 1D11) and Jews (G Ex. 1D27).

The nature of LET is critical to this case because seven of the persons named in the indictment, including Chapman and Khan, spent time at LET camps in Pakistan. As early as April 2000 Royer traveled to LET. He later told Surratt that it was a good group, not engaged in terrorism but fighting for Muslims in Kashmir. Al–Timimi also praised the group. After those discussions Surratt began researching LET on the web. He did not need any help in locating the Taiba Bulletins.

Al–Hamdi testified that he had dreamed of dying shaheed since he was twelve years old, and he attended the LET camp in pursuit of this goal. After seeing some videotapes about jihad, he tried to get into Chechnya to fight for the Muslim forces, but was turned away because he lacked jihad training. Early in 2000 he met with co-conspirator Royer to discuss how to get such training. Royer told him about LET

as a "straight path" for such training. In a second discussion Royer told him that the LET was actively fighting the Indians in Kashmir. The two of them decided to go to Pakistan to get LET training. Royer went to LET in April 2000 (G Ex. 1A1). Because Al–Hamdi was the son of a Yemeni diplomat, his visa application was delayed. When Royer returned, which had to be in May 2000, he told Al–Hamdi at the Center about his training experiences with LET, including firing live rounds on the front lines, endurance training, and firing AK–47 and PK weapons. In a meeting at the Center, Royer spoke to a group including Abdur–Raheem about LET and the training it provided. Al–Hamdi testified that Royer freely discussed his jihad experiences both in Bosnia and at the LET camp, both during paintball and at the Center. Al–Hamdi's testimony about wanting to die shaheed was corroborated by Kwon who described Al–Hamdi as being ashamed that he did not know anyone who had died shaheed and how he wanted such a death. Al–Hamdi finally got a visa and left for Pakistan on August 21, 2000 (G Ex. 3C2). Before leaving, Royer made a call to the LET officials introducing Al–Hamdi and gave Al–Hamdi a business card (G Ex. 3A12). Al–Hamdi was sure he told Khan, Abdur–Raheem, Kwon, and other paintballers the real reason he was going to Pakistan just before he left.

Aatique confirms that testimony. He testified he heard about Al–Hamdi's plan to go to LET and die shaheed, before Al–Hamdi left. Although he could not recall who was present, he was sure other players were around. Afterwards there was a general discussion at the paintball sessions about Al–Hamdi's trip. Aatique first saw Al–Hamdi again at the Center after he returned from LET in September 2000. Aatique testified that Al–Hamdi and some of the paintballers walked off together so Al–Hamdi could tell them privately what he had done. He remembered Abdur–Raheem and Chapman being among those paintballers. Gharbieh noticed them and warned them not to congregate like that. Everyone was surprised to see Al–Hamdi because they had expected he would die fighting.

Al–Hamdi confirmed Aatique's account by testifying that after he returned from LET he attended a meeting at the Center. He recalls Abdur–Raheem and Caliph Basha being present, with Chapman joining them later. Although Al–Hamdi later admitted embellishing what he actually did at LET, he told those present about firing weapons and being fired at. This evidence is credible and seriously undercuts the defendants' argument that they were unaware that members of their group were attending jihad camps overseas.

Al–Hamdi, Aatique, Hasan, and Kwon testified about the posters they saw at the LET office in Lahore. One poster included the LET flag, along with a rifle firing through a burning balloon marked with the Indian flag, and balloons marked with American and Israeli flags next to it. The text reads, "Yesterday we saw Russia disintegrate, then India, next we see America and Israel burning" (G Ex. 1F3). Another poster shows the LET flag flying, a boot on an American flag, and the United States Capitol in flames (G Ex. 1F4). Another shows an LET flag and a soldier with an LET patch on his shoulder firing a rifle at burning Indian, American, and Israeli flags (G Ex. 1F6).

Chapman testified that he traveled to the LET camp in August 2001. Royer suggested the camp to him, saying that LET were good Muslims who provided free military training and that the mountains were scenic. Royer called his LET contact from Chapman's home phone to arrange Chapman's visit. Chapman testified that he did not see any anti-American posters at the LET offices in Lahore, which we

find incredible considering the consistent testimony of four other witnesses that such posters were prominently displayed. Chapman spent about 30 days at the camp—3 days in weapons training, where he fired an AK–47 and other firearms, and the remainder of the time hiking in the mountains and performing military drills. On September 11, 2001, he learned of the attacks on America through a report on BBC radio, and began his journey back to the United States.

### D. The September 11, 2001 meeting

Prior to September 11, 2001, a meeting had been scheduled at the Center for that evening. Given the events of that day, the gathering turned into a discussion of the attacks. Several of the conspirators attended. Gharbieh, Surratt, and Haytham Abu–Hantash, one of the founders of the Center, testified to a verbal altercation between Al–Timimi and Hantash. Gharbieh and Surratt testified that Al–Timimi stated that the attacks may not be Islamically permissible, but that they were not a tragedy, because they were brought on by American foreign policy. Both witnesses also testified that Hantash responded angrily that the attacks could not be justified. Hantash, who was called as a defense witness, also testified that such an exchange occurred. Hantash characterized it as Al–Timimi making a scholarly quibble with Hantash's statements that attacks on innocents are never Islamically permissible. Al–Timimi cited authority that innocent persons may be attacked if an enemy is using them as human shields. Hantash told Al–Timimi that such comments were not appropriate immediately after the attacks, and reiterated that the attacks were to be condemned. Although Hantash tried to minimize Al–Timimi's comments as scholarly quibbles, both Gharbieh and Hantash testified that Al–Timimi was not invited to speak at the Center after September 11, and the Cen-

ter purged its bookstore of all speeches by Al–Timimi. Both the defendants and the government introduced speeches by Al–Timimi into evidence. Although in one speech from 1993 Al–Timimi condemns terrorism and the airplane hijackings (K Ex. 117), the more recent speeches that Al–Timimi gave at the Center endorse violent jihad (G Ex. 2A10, 4A12, 4A14). Among the topics of Al–Timimi's lectures at the Center was the "end of time" battle between Muslims and non-Muslims.

### E. The September 16, 2001 meeting

Kwon testified that after September 11 he organized a meeting at the urging of Al–Timimi to address how Muslims could protect themselves, and invited only those brothers who had participated in paintball training and owned weapons. Attendees at this September 16, 2001 meeting included Kwon, Al–Timimi, Royer, Aatique, Hasan, Caliph Basha, Gharbieh, Khan, and Abdur–Raheem. Chapman was in an LET camp at that time.

The government presented testimony about this meeting from Gharbieh, Aatique, Hasan, and Kwon. We find the accounts of the first three witnesses fully credible, because the demeanor of the witnesses was candid and their separate accounts generally consistent. Although we are troubled by some inconsistencies in Kwon's testimony, we credit his testimony to the extent it is corroborated by the testimony of the other three witnesses. Abdur–Raheem discussed the meeting during his own testimony, and his account is generally consistent with that of the cooperating witnesses.

At the beginning of the meeting, Al–Timimi told the attendees that the gathering was an "amana," meaning that it was a trust that should be kept secret. The secrecy was underscored by having the window blinds drawn and the phones dis-

connected from the wall. The secrecy of the meeting was further reinforced when Gharbieh arrived with "Sherdil," who was not a member of the paintball group and was not well-known to other attendees. When Gharbieh and Sherdil arrived, discussion stopped, Royer asked Gharbieh why he had brought Sherdil, and the discussion did not resume until Gharbieh and Sherdil left.

At the meeting, Al–Timimi stated that the September 11 attacks were justified and that the end of time battle had begun. He said that America was at war with Islam, and that the attendees should leave the United States. The preferred option was to heed the call of Mullah Omar, leader of the Taliban, to participate in the defense of Muslims in Afghanistan and fight against United States troops that were expected to invade in pursuit of Al–Qaeda. As support for this proposition, Al–Timimi cited "fatwas," or religious rulings, that called on Muslims to defend Afghanistan against impending American military action (G Ex. 7A20, 7A20a). According to Hasan and Kwon, Khan asked to review the fatwa, and Al–Timimi gave it to him to read, but advised Khan to burn it after he had read it. The other option presented to the attendees was to make "hijrah," that is, to relocate their families to a Muslim country. Royer said that anyone who wanted to fight in Afghanistan would first need to participate in military training, that the LET camps in Pakistan were a good place to receive that training, and that Royer could facilitate their entry to the LET camps.

After the meeting, Khan, Kwon, Aatique, and Hasan agreed to go to LET for training. Aatique, Hasan, and Kwon admitted that each of them had the intent to receive training that would allow him to proceed to Afghanistan and fight on behalf of the Taliban and Mullah Omar against United States troops. The evidence does not, however, establish any intent to fight in other regions, such as Kashmir or Chechnya, or to fight on behalf of LET.

### F. Trip to LET camp

Aatique had already planned a trip to Pakistan to pick up his family, who had been visiting Pakistan during the summer, and he told the other attendees that he would attend the LET camp during his trip to Pakistan. Upon learning of Aatique's travel plans, Khan arranged to take the same flight to Pakistan, leaving from JFK airport in New York. Hasan and Kwon also made plans to travel to Pakistan. Hasan and Khan made plans to meet in Karachi before traveling to LET together. In preparation for the trip, Kwon ordered jackets from a catalog for himself, Hasan, and Abdur–Raheem,[6] because Khan recommended such a jacket for the mountain climate in Pakistan where the LET camps were located. Khan had ordered an identical jacket for himself one day earlier.[7] Royer phoned his contact in LET and provided aliases and descriptions for Khan, Aatique, Hasan, and Kwon. Several witnesses testified that Khan's alias, or "Abu name," was "Abu Ibrahim." Ibrahim is the name of Khan's son, and the convention in forming "Abu names" is to use the name of a son. On

---

**6.** Abdur–Raheem never traveled to the LET camp, and several witnesses testified that Abdur–Raheem never expressed the intention to do so. He explains that he purchased the same jacket as the others because it seemed to be a good bargain.

**7.** The government argues that these jackets are significant because they are obviously intended for cold weather, which would not be consistent with the climate in Karachi where Khan's family lived, but would be consistent with the climate in the mountains where the LET camps were located.

September 18, 2001, Hasan and Kwon drove Khan to Aatique's house in Pennsylvania. The next day, Aatique and Khan traveled to JFK airport for their flight to Karachi. The conspirators discussed "cover stories" that they would use to disguise the true purpose of their trip—Khan maintained that his travel was to testify in a court proceeding, Aatique cited his plan to pick up his family, and Hasan and Kwon said that they planned to attend a wedding. Al–Timimi advised Hasan and Kwon on how to travel without drawing attention to themselves.

After arriving in Karachi, Khan, Hasan, and Kwon met and traveled together to the LET office in Lahore. Aatique had already traveled to Lahore, and for a day or two the four were at the LET camp together. During their time at LET, Khan, Hasan, and Kwon traveled through several different camps and received training on commando tactics and weapons. Aatique saw Khan fire an anti-aircraft gun, and Hasan and Kwon testified that both they and Khan fired an AK–47, an anti-aircraft gun, and a rocket-propelled grenade. Khan did not submit any evidence that would refute the evidence that he fired these weapons at the LET camp, nor did he impeach the consistent accounts of the witnesses. Moreover, the accounts of these witnesses as to their activities at the LET camps are consistent with the accounts of Al–Hamdi and Chapman, who attended the LET camps at other times. Therefore, on this evidence we find that Khan fired an AK–47, an anti-aircraft gun, and a rocket-propelled grenade at the LET camps.[8]

### G. Khan's and Chapman's support to LET

During their time at LET, Khan, Hasan, and Kwon learned through reports on BBC radio that United States forces were defeating the Taliban in Afghanistan, and also learned that Pakistan had closed its border with Afghanistan and that LET would not facilitate their travel there. Moreover, Pakistani authorities were aggressively removing foreigners from the camps. As a result, the defendants were required to leave the camps. Both Hasan and Kwon communicated their regret over the early termination of their training. According to Kwon, before he and Khan left the camp, they were approached by two men Kwon knew as "Abu Baraa" and "Disco Mujaheddin," who requested their help with a special mission but declined to give specifics. Ultimately, Abu Baraa and Disco Mujaheddin asked Khan and Kwon to return to the United States, gather information, and spread propaganda. Khan returned to the United States in December 2001 but Kwon stayed in Pakistan and started a mango export business.

Both Kwon and Chapman testified about their contacts with a man they encountered at the LET camp known as "Abu Khalid." Khalid was described as a Pakistani man who spoke English with a British accent, and worked at the LET office in Lahore. On rebuttal, Kwon testified he believed Khalid was a high official in LET because he had a driver. By the summer of 2002, Kwon had overstayed his visa in Pakistan. He believed that Abu Khalid might be able to help with the visa prob-

---

8. We accept the defendants' evidence that the firing of these weapons was highly limited in that very little ammunition was provided. It is also clear that the LET camp system was graded, so that as one went up the mountains the camps became more intense, with the final camp being the one where final preparation for jihad in Kashmir occurred. Kwon discussed this structure in detail. We accept that the defendants in this case never attended the final camp as evidence that they never took the final step in joining LET's attacks on Indian positions in Kashmir, a Neutrality Act violation. However, their participation in the lower camps is evidence supporting their participation in the conspiracies alleged.

lem, but Kwon did not have a way to contact him. Kwon e-mailed Khan to request Abu Khalid's contact information. Khan passed the request on to Chapman, who sent Kwon Abu Khalid's e-mail address: johninformation@yahoo.co.uk. This 2002 contact with Khalid and LET was extremely significant in our view, because it undercuts Chapman's argument that his early return to the United States after September 11, 2001 evidenced his disavowal of any further contact with LET, which the United States Department of State had officially declared a terrorist organization in December 2001.

Chapman testified that Abu Khalid, who used the johninformation e-mail account, is the same person as Pal Singh, who uses the email address of psingh@hotmail.com. Chapman's testimony that Abu Khalid and Pal Singh are the same person is buttressed by technical evidence that the government introduced through Evan Kohlmann, a witness familiar with the Internet sites routinely accessed by the coconspirators and with Internet addressing protocols generally. The johninformation@yahoo.co.uk account was created in the summer of 2001 from an Internet connection at Coventry University in England, by someone using the alias "John Smith" (G Ex. 4C4a). As discussed below, Chapman shipped video equipment for a model airplane to Pal Singh in Coventry, England.

Other technical evidence introduced through Kohlmann was that the psingh@hotmail.com account was accessed in 2003 from Pakistan, Hong Kong, and College Park, MD (G Ex. 5A6a, 7C17). Based on this evidence, and because Kwon encountered Khalid in Pakistan and Chapman encountered Singh in the United States, we draw the inference that Singh routinely travels between Pakistan, the United Kingdom, and the United States.

On March 27, 2002, Pal Singh tried to purchase a wireless video module for use in a model aircraft over the Internet from www.wirelessvideocameras.com. For descriptions of the following transaction, we rely on the testimony of Monte Salot, the President of Wireless Video Cameras, as well as documents and e-mails regarding the transaction maintained by that company (G Ex. 4C3). Chapman's testimony confirmed most of this evidence.

As the documents establish, Singh purchased an AA5 OR–2 airborne video system, which includes a camera and transmitter that can be installed in a model airplane and will transmit video images back to a receiver from as far away as 5 miles. The range can be extended to 15 miles with use of an amplifier, which was included in the system that Singh ordered. The return address on the e-mail order shows that Singh placed his order from Coventry, England, but the vendor was unable to confirm the overseas credit card and notified Singh of this problem by e-mail to psingh@hotmail.com. Singh responded to that e-mail by phone, explaining that Seifullah Chapman in Alexandria, VA would purchase the device on Singh's behalf and that the vendor should ship it to Chapman. Chapman admits that he agreed to make the purchase for Singh. Chapman paid the $986 charge from his debit card account, as shown by the record that was the subject of the Motion to Suppress discussed in section I.B., *supra.* Once payment was confirmed, the vendor shipped the system to Chapman on April 8, 2002, and Chapman forwarded it to Singh in Coventry.

In the summer of 2002, Singh advised the vendor by e-mail that he was having problems with the system and that it was not transmitting video over the range that had been promised. After some troubleshooting advice failed to solve the problem,

Singh shipped the system back to the vendor, who discovered that the wrong type of battery had been installed, replaced the battery, and returned the device to Chapman at his new address in Alexandria on July 10, 2002. Chapman testified that about a month before, Singh had contacted him and asked for a place to stay when visiting the Washington, D.C. area. Because Chapman had a newborn child and was busy with work, he only agreed to host Singh for two days, and arranged for Singh to stay with Khan for a few more days.[9] Sometime after this visit, Chapman received the repaired video device from the vendor. By this time, he was preparing to leave the country for his job teaching English in Saudi Arabia. Because Chapman was giving some of his hunting equipment to Khan's brother Ahmed, and because Chapman knew Singh had been to Khan's house before, he brought both the hunting gear and the video device to Khan's house, with the understanding that Singh would pick up the video device from there. Given Singh's relationship with LET, Chapman's continued involvement with him in 2002 is strong evidence of providing material support to LET.

In December 2002, Khan purchased from Vesta Technologies an MP–1000SYS airplane control module. According to the testimony of Cindy Reish, general manager of Vesta Technologies, and the documents regarding the transaction maintained by that company (G Ex. 2C2a), the MP–1000SYS is a stability and control computer that can be programmed to fly an airplane with a 10–12 foot wingspan using Global Positioning System ("GPS") coordinates. The unit controls altitude, speed, and navigation to programmed waypoints, and can also be programmed to turn a video camera on and off when the airplane reaches certain locations. The majority of Vesta's customers for this technology are universities and the government, including NASA and the military. Common applications of the technology are using model airplanes equipped with video devices to monitor forest fires, property boundaries, gas lines, or livestock in remote or inaccessible areas.

Khan first attempted to order the device from Vesta by telephone in December 2002. According to Reish, Khan stressed the urgency of receiving the device before the end of December, and seemed reluctant to fill out paperwork. Reish insisted that Khan fill out the appropriate paperwork, and faxed him an order form on December 11, 2002. Although Vesta is not required to conduct due diligence on domestic purchasers, Reish was suspicious enough of the transaction that she also requested that Khan answer export control questions on the order form. Khan completed the paperwork and faxed it back to Vesta. On the form he listed his address in Gaithersburg, MD and phone number, and indicated that the intended use was "Radio Controlled (RC) model aircraft pilot assist." Other potential uses listed on the form, not selected by Khan, included "Commercial robotic aircraft" and "Military Unmanned Aerial Vehicle." Vesta checked Khan's name against lists of prohibited purchasers for export, and not finding him listed, shipped the device to Khan on December 30, 2002.

Both Salot and Reish testified that the wireless video equipment purchased by Chapman and the airplane control module purchased by Khan are compatible with one another, and that the two types of equipment are commonly used together on model airplanes.

Neither the wireless video device that Chapman purchased for Singh nor the airplane control module ordered by Khan

9. Chapman explained that Muslims are supposed to host guests for three days.

were found in the search of Khan's home, and Khan submitted no evidence to indicate the disposition of either. From other evidence in the record, however, we conclude that Khan transferred both devices to Singh. Specifically, the government introduced an e-mail on Khan's computer dated November 28, 2002 from johninformation@yahoo.co.uk asking Khan to order an MP–1000SYS and paintball equipment, and stating, "THANKS BRO DO THIS ASAP AGAIN ASAP ILL TRY NOT TO BOTHER U AGAIN THE MONEY SHOULD BE IN UR ACC CONTACT ME IF NOT" (G Ex. 2A20a). Days later, Khan placed the order with Vesta. Moreover, the home phone number that Khan listed on the Vesta order form is the same as the phone number listed for "ibrahim staates" [sic] in an e-mail seized from the johninformation@yahoo.co.uk account (G Ex. 4A3). As discussed above, at LET Khan used the alias Abu Ibrahim. Lastly, no evidence was introduced to suggest that Khan had any hobby interest in model airplanes.

We find, based on both Chapman's and Kwon's testimony, that Singh a/k/a Abu Khalid plays a major role in LET operations. The significance of the evidence that Chapman and Khan both provided model airplane and wireless video equipment to an LET operative is demonstrated by the Taiba bulletin dated June 11, 2000 which stated, "Lashkar–e–Taiba also made a remote control aeroplane that was caught in Occupied Kashmir. We are developing the modern technology. We can make modern devices." (G Ex. 1D16). From this evidence, we draw the inference that Singh's procurement of model airplane equipment was for LET's military use in Kashmir. Because Khan knew of Singh's connection with LET and balked at completing paperwork, we find that Khan was aware and intended that his straw purchase of the autopilot module was for LET's military use.

## H. Evidence relating to Abdur–Raheem

Abdur–Raheem testified that although he was raised Christian he became interested in Islam while serving in the United States Army and officially converted in 1994. After being honorably discharged he moved to Maryland in 1996 to attend Prince George's Community College. Although the defendant spoke in a quiet, calm voice that would appear inconsistent with a person inclined to pursue violent jihad, the Court finds that defendant's written statements, activities supporting fighters in Chechnya, actions on the paintball field, and incredible testimony support the government's view of his activities.

Before 1999 Abdur–Raheem had become preoccupied with what he perceived to be Russian oppression of Chechen Muslims. Because he was upset to hear Muslims called terrorists when they opposed aggression, he began to research areas of the world such as Bosnia and Chechnya where Muslims were fighting. Through a series of e-mails with a Chechan official known in this case as John Doe, Abdur–Raheem exhibited a strong commitment to furthering militant jihad. For example, on September 23, 1997 John Doe e-mailed defendant that "the best way to get into Chechnya is through Georgia" and offers to send contact information (G Ex. 5G2).[10] On October 2, 1999, defendant sent John Doe an e-mail to explain that he had created a business under the name of Chechan Zakat,

10. The government argues that this e-mail establishes that Abdur–Raheem was trying to get to Chechnya to fight. Abdur–Raheem explains that it was just a response to a question. We find the government's interpretation more reasonable given the specific words in the e-mail.

P.O. Box 90951, Washington, DC, with the e-mail address of chechenzakat@hotmail.com and set up a bank account (G Ex. 5G3). On November 5, 1999 Abdur–Raheem applied for a Certificate of Fictitious Name from Fairfax County, Virginia under the name Chechan Zakat, listing the purpose of the organization as "charitable" (G Ex. 5C7). Contrary to what he wrote on his application for that certificate, defendant wrote in an e-mail that the real purpose was to "provide assistance to the Islamic fighters (mujahideen) in Chechenia [sic]". Abdur–Raheem wrote in another e-mail: "Officially, I am helping the refugees of Chechenia. In reality, however, I am helping the Mujahideen.... When I send money, I must send it in small amounts at a time to avoid attracting the enemies of Islam.... Also, after you have read the messages please erase them. I really don't need the wrong person getting a copy of the messages." (G Ex. 5G5).

On November 5, 1999, John Doe e-mailed Abdur–Raheem about a contact in Turkey to whom mujahideen funds should be sent (G Ex. 5G6). On the same day Abdur–Raheem forwarded an e-mail to a person named Sattar concerning an interview with Ibn–Ul–Khattab, one of the mujahideen leaders in Chechnya. The article quotes Khattab saying that "Usama bin Laden is our brother in Islam. He is someone of knowledge and a Mujahid fighting with his wealth and himself for the sake of Allah.... It is an obligation for all the Muslims to take on the Jihad and fight for the sake of Allah.... Talking about the Jihad is not sufficient. You have to be in the battlefield in order to spread Islam and the correct information to the rest of the Muslim world." (G Ex. 5G7). This is the same Khattab who is shown in the Russian Hell 2000 video executing an unarmed Russian prisoner (G Ex. 3A8). That video was shared among the paintballers, including Chapman.

Some time in late 1999, Surratt and Abdur–Raheem met to discuss a plan to set up a separate pure Islamic community. Abdur–Raheem had been researching separate communities since 1994. Both Surratt and the defendant identified a document called "Things to Discuss" which sets out the goals for such a community and various concerns. The third item on the document is titled "Our Aim", under which is written "to prepare ourselves to be able to protect ourselves and our families." On the second page under the heading "Secondary Matters," the document lists "recruit or joining [sic] process of future members" and "address and stress the issue of not breaking any laws of the U.S.A." [11] Also listed are "plans for action if something kicks off" and "all join the NRA" (G Ex. 7A7). This document was in Surratt's possession as of May 8, 2003, when the FBI seized it. Whether by coincidence or planning, several co-conspirators including Kwon on October 6, 1999 (G Ex. 7C2), Abdur–Raheem and Surratt on February 24, 2000 (Exs. 5C6 and 7C4), Caliph Basha on March 9, 2000 (G Ex. 6C1), Gharbieh on April 13, 2000 (G Ex. 7C5), Al–Hamdi on May 6, 2000 (G Ex. 3C3), and Hasan on September 24, 2000 (G Ex. 7C3) joined the National Rifle Association ("NRA"), and on April 19, 2001 Chapman joined the Quantico Shooting Club. (G Ex. 4C7).

---

11. The defendant claimed responsibility for adding that issue, and cites it as proof he had no intention of violating United States law. However, the defendant's purported respect for law is contradicted by his false statements on Virginia business documents that Chechan Zagat was a charity, signing false documents to cover the transfer of firearms among defendants (G Ex. 5A2, 1C1), and destroying his computer hard drive to hide potentially incriminating evidence and then telling FBI agents that the hard drive was missing due to technical problems.

Abdur–Raheem also engaged in a stream of Internet bulletin board exchanges about jihad. These include a January 6, 2000 posting to the Chechnya Yahoo! Group under the subject "Islam and Christianity are at War!", about recent clashes between Christians and Muslims, and the locations throughout the world ("Egypt, Indonesia, Bosnia, Philipines [sic], and Chechnya") in which Muslims are fighting Christians. Abdur–Raheem commented about Muslims in Bosnia that "They had no guns. They had no training on how to fight and defend their own families. They were caught completely off guard by the Christians." (G Ex. 5F47). On January 9, 2000, he posted another message to the group under the subject "Re: Islam and Christianity are at War!", stating that "Yes brother the whole world is at war with Muslims, but Muslims are still sleeping." (G Ex. 5F48). Under the subject "The Russians Don't Stand a Chance", he stated that. "Russian embassies all over the world are on high alert. The Russians realize that if you kill Muslims in one part of the world, other Muslims will kill you in another part of the world. May Allah accept that brother in Lebanon that raided the Russian Embassy as a shahid insha Allah. We need more of this in my opinion." (G Ex. 5F49). On January 15, 2000, Abdur–Raheem posted a message to the Chechnya's Friends Yahoo! Group under the subject "Re: SOON ENDING WAR: A dream from Virgin[ia]", commenting that "Many American Muslims want to go to Chechnya. Those who cannot go are sending money to charity organizations. The events in Chechnya are being discussed all over the Muslim world. Muslims, to include me, are very concerned about this war." (G Ex. 5F15).

Lastly, in spring 2003, Abdur–Raheem learned that Caliph Basha had told SA Wyman that paintball was jihad training and that the reason the paintball participants had acquired AK–47–style rifles was that they were the type of weapon used overseas. Abdur–Raheem placed a call to Royer, which was intercepted. In that call Abdur–Raheem complained that Caliph Basha had "cracked" (G Ex. 1G3).

Based on this evidence of Abdur–Raheem's state of mind during the alleged conspiracy, we do not credit his testimony that paintball was strictly for recreation and physical fitness. Instead, we find that he knew that Royer, Al–Hamdi, and others were interested in getting military training to prepare for jihad actions.

### I. Evidence relating to Chapman

Chapman presented documentary and testimonial evidence to establish his honorable career in the United States Marine Corps, his solid academic record, and his stable family life. He testified that he is a moderate Muslim who does not subscribe to terrorism. He consistently tried to downplay the significance of his involvement in paintball and his knowledge about the way many of the players viewed paintball as training for jihad. We found this testimony incredible in light of the consistent testimony of Gharbieh, Thompson, Surratt, Aatique, and Kwon about how intense Chapman was about the training drills and the need for discipline. When asked, for example, why latecomers were punished with physical marine-type discipline like push-ups, rather than being penalized by having to miss a game, he did not have a credible answer. Gharbieh testified that Chapman often sang nasheeds (war songs praising jihad which the Court heard on some of the violent videos in evidence) during paintball, and once said that anyone who is going to fight needs to know nasheeds. Kwon also testified that Chapman sang nasheeds. Chapman denied ever singing nasheeds. We find Gharbieh and Kwon credible on this point.

Thompson testified that Chapman described paintball as a stepping stone to jihad training camps, and Surratt quoted Chapman as saying, "We're going to learn to fight." Chapman denied these statements, however, in light of the testimony and documentary evidence, we find Thompson and Surratt more credible.

Chapman's testimony about the LET camp was also incredible. Despite consistent testimony from the witnesses about how openly Royer and Al–Hamdi talked about their experiences at LET, Chapman claims he had no idea about LET's stated mission to fight India before he left for the camp. We do not accept his statement that he knew nothing about the violent mission of this group, because the Taiba Bulletins were easily available on the Internet. The paintballers posted numerous links to jihad-oriented groups on their paintball Website and e-mailed each other such information. Chapman even sent from his work e-mail account to his home account an article titled, "Martyrs: The Building Blocks of Nations," which stated, "History does not write its lines except with blood" (G Ex. 4G3). Although Chapman may not have read the specific Taiba Bulletins entered into evidence, they are relevant as examples of the types of information publicly available. Various articles in mainstream newspapers, including the Washington Post, described LET's violent activities in 2000. It is simply implausible that a well-educated man, deeply involved in issues affecting Muslims, who described himself as a student of military history, and who associated with persons obsessed with jihad would not have been aware of the violent activities of LET.

Equally implausible is Chapman's explanation that he chose to go to LET in August 2001 for the scenery, outdoor activities, and low cost, without checking the LET Website before traveling halfway around the world. That statement is inherently incredible. Chapman has to deny looking at the website because had he admitted viewing it, he could not say he was unaware of LET's violent mission.

Further implausible testimony focused on what Chapman did after he returned from LET. Given his friendship with Khan and their both having been to LET in September 2001, it is inconceivable that on weekly hikes they took in the spring of 2002 they never discussed their experiences at LET. Similarly, it makes no sense that Chapman would not have compared notes with Al–Hamdi, who had married Chapman's sister-in-law, and was therefore part of Chapman's family. Lastly, if going to the LET camp was innocent, Chapman would have had no reason to lie to FBI agents in July 2003 when they asked him if he had ever received jihad training or been to LET when he was in Pakistan. Chapman answered no to both questions, and falsely told SA Christopher Mamula that he had gone to Islamabad to go hiking. Chapman explained at trial that the agents did not ask him about attending an LET camp, but asked about a terrorist camp, and Chapman did not consider the LET camp to be "terrorist." SA Mamula denied using the word "terrorist" during questioning. However, even if that word was used, Chapman's perception that LET was not a terrorist group cannot be justified after December 2001, when it was officially declared a terrorist group, as discussed in an e-mail Royer sent to Chapman (G Ex. 4G4). Lastly, as discussed above, Chapman's continued contact with Singh a/k/a Abu Khalid and his willingness to help Singh obtain the video equipment for LET undercuts any claims of an innocent relationship with LET.

Because we find so many aspects of Chapman's testimony utterly implausible, we do not credit his innocent explanations

for a series of incriminating acts over the course of several years.

### J. Evidence relating to Khan

Khan presented the testimony of his mother, Elisabeth Khan, and supporting documentation to establish that the purpose of his post–9/11 visit to Pakistan was to bring legal documents and make a court appearance regarding the probate of his late father's estate, which had been in litigation for years. Khan produced an e-mail message sent by Omar Khan dated September 11, 2001 requesting urgent documents. (Khan Ex. 109) We credit this evidence and find that one purpose of Khan's trip to Pakistan was to participate in legal proceedings. However, given the evidence that he also planned to attend, and indeed did attend, an LET camp during this trip, we do not find that the legal proceedings were his primary reason for traveling to Pakistan.

We accept Khan's argument that he was not a member of the paintball group. The evidence showed that he played paintball only once, and that was at a public course, not the private farm in Spotsylvania County, where the paintball activities in furtherance of the conspiracy occurred. We also find no evidence that Khan was a regular attendee at the Center. However, the evidence clearly establishes that Khan knew many of the conspirators and was close enough to Kwon and Al–Timimi to be welcome at the meeting on September 16, 2001. Moreover, the evidence of Khan's continued involvement with LET through his communications with Singh undercuts his argument that he was not a part of this conspiracy.

### III. Conclusions of Law

#### A. Conspiracy counts

##### 1. Count 1

The essential elements of a conspiracy charged under 18 U.S.C. § 371 are 1) an agreement by two or more persons to perform some illegal act, 2) willing participation by the defendant, and 3) an overt act in furtherance of the conspiracy. *United States v. Meredith,* 824 F.2d 1418 (4th Cir.1987). As to Count 1, the general conspiracy alleged five objects as the underlying illegal acts: 1) violation of 18 U.S.C. § 960, the Neutrality Act; 2) violation of 18 U.S.C. § 2390, enlistment to serve against the United States, 3) violation of 18 U.S.C. § 924(b), receipt of firearms or ammunition with cause to believe that a felony will be committed therein; 4) violation of 18 U.S.C. § 924(g), interstate travel to acquire a firearm in furtherance of a Neutrality Act violation; 5) violation of 18 U.S.C. § 924(h), transfer of a firearm in furtherance of a Neutrality Act violation.

For object one, the Neutrality Act violation, the essential elements are: 1) a military expedition organized in this country; 2) against the territory or dominion of any foreign prince or state, or of any colony, district, or people with whom the United States is at peace; and 3) defendant provided means for the expedition in this district, with knowledge of its character. Based on our findings of fact above, we find that defendants Chapman and Abdur–Raheem participated in an agreement to organize, from this district, expeditions to join LET attacks on India, with whom the United States was then, and remains, at peace. Chapman and Abdur–Raheem furthered the conspiracy by training co-conspirators in combat skills through paintball games and the acquisition of weapons, with the knowledge that some co-conspirators had already traveled to Kashmir and fired on Indian positions, and with the expectation that other co-conspirators would do the same, using the training that Chapman and Abdur–Raheem provided. We find, however, that the government has

not established beyond a reasonable doubt that Khan entered into a conspiracy to violate the Neutrality Act. There is insufficient evidence that Khan himself planned to fight against India or Russia, countries with which the United States was then, and remains, at peace, or that he intended to aid others in doing so. Although Khan did travel to LET, the evidence shows that the trip was for the purpose of receiving training to fight in Afghanistan, not on behalf of LET in its conflicts with India.

 For object two, enlistment to serve against the United States, the essential elements are: 1) enlistment or engagement within the United States or any place subject to the jurisdiction thereof, 2) with intent to serve in armed hostility against the United States. 18 U.S.C. § 2390. As we held in considering motions to dismiss the indictment, the only armed hostility alleged against the United States occurred in Afghanistan. The plain language of the statute "enlists or is engaged" is not limited to formal enrollment in an enemy military force, but can reach preparations within the United States for joining an enemy force overseas. As to Khan, we find that at the September 16, 2001 meeting at Kwon's house, Khan agreed with Royer, Kwon, Aatique, and Hasan to enlist or engage in armed hostility, and that by joining together within the United States to plan a trip abroad, the four conspirators enlisted to serve against the United States. Chapman was not present at the September 16 meeting, therefore he could not have joined that agreement. Although Abdur–Raheem was present, he did not join the plan and took no action to further it. Accordingly, we find that the government has not proved that these two defendants conspired to commit this offense. There is no evidence that the conspiracy in which these two defendants participated ever contemplated serving in armed hostility against the United States.

 For object three, the essential elements are: 1) shipping, transporting, or receiving a firearm or any ammunition; 2) in interstate or foreign commerce; 3) with intent to commit a predicate offense therewith, or with knowledge or reasonable cause to believe that a predicate offense would be committed therewith. 18 U.S.C. § 924(g). The predicate offenses designated in the government's bill of particulars include conspiracy to violate the Neutrality Act, conspiracy to provide material support to LET, conspiracy to provide services to the Taliban, and conspiracy under 18 U.S.C. § 959. For the reasons discussed in our findings of fact above, we believe that each element of this object has been proven beyond a reasonable doubt for Chapman and Abdur–Raheem. The evidence as to the defendants' possession and sale of numerous AK–47 firearms is uncontested. The witnesses' statements, including Caliph Basha's admission, that these weapons were chosen because they were similar to the weapons used by mujaheddin overseas. Both Abdur–Raheem and Chapman helped co-conspirators obtain these weapons, and both signed false documents concerning their transfer and sale. The conspiracy included training with these weapons, and therefore furthered a Neutrality Act violation. Moreover, the weapons and ammunition traveled in interstate commerce. Because we do not find sufficient evidence that Khan received weapons to further any conspiracy, however, we do not find object three proven as to Khan.

 For objects four and five, an essential element of each count is a Neutrality Act violation. We have already found that Chapman and Abdur–Raheem conspired to violate the Neutrality Act, and that Khan did not. We now consider the other elements of each object as to Chapman and Abdur–Raheem. For object

four, the essential elements are: 1) traveling from any state or foreign country into any other state; 2) acquiring, transferring, or attempting to acquire or transfer, a firearm in such other State; 3) in furtherance of the Neutrality Act violation. In ruling on motions to dismiss the indictment, we held that *United States v. Bass*, 404 U.S. 336, 349, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), required a nexus between the interstate travel and the acquisition of firearms, and that whether such a nexus existed was a question of fact. After reviewing all the evidence, we find that the necessary nexus has not been established. The evidence shows that the acquisition and transfer of firearms in furtherance of the conspiracy occurred within Virginia, and any interstate or international travel that Chapman and Abdur–Raheem undertook is not related to the transfer of firearms, either in time or in purpose.

▮▮▮▮ Object five is similar, but does not include the interstate travel element. The elements of object five are: 1) transferring a firearm; 2) knowing that such a firearm will be used to violate the Neutrality Act. The evidence shows that conspirators, including Chapman and Abdur–Raheem, transferred firearms among themselves, and the defendants knew that the firearms would be used to prepare for military expeditions overseas, in violation of the Neutrality Act. Therefore, the government has proved that Chapman and Abdur–Raheem conspired to commit the illegal act alleged in object five.

▮▮▮▮ Because the evidence presented proves that each defendant conspired to commit at least one object of the conspiracy, we find all defendants guilty of Count 1. In reaching this conclusion, we have considered whether Count 1 alleges a single broad conspiracy or multiple smaller conspiracies. Whether the government has proven a single conspiracy or multiple smaller ones is a question of fact. *See,*

*e.g., United States v. Roberts*, 262 F.3d 286, 294 (4th Cir.2001), *cert. denied,* 535 U.S. 991, 122 S.Ct. 1548, 152 L.Ed.2d 473 (2002); *United States v. Harris*, 39 F.3d 1262, 1267 (4th Cir.1994). In this case, the overlapping relationships of the defendants, their shared interest in jihad, attendance at the LET camp, and being part of the trusted circle of Al–Timimi are sufficient evidence of membership in one overarching conspiracy with multiple goals.

### 2. Counts 2, 3, and 4

Respectively, Counts 2, 3, and 4 charge Khan with conspiracy to levy war against the United States, conspiracy to provide material support to al-Qaeda, and conspiracy to contribute services to the Taliban. The factual allegations supporting all three counts are that, after the attacks of September 11, 2001, Khan joined a conspiracy to fight on behalf of the Taliban in Afghanistan against an expected invasion by United States forces pursuing Al–Qaeda and Osama bin Laden.

▮▮▮▮ The elements of Count 2 are: 1) a conspiracy, 2) to overthrow, put down, or to destroy by force the Government of the United States, or to levy war against them, or to oppose by force the authority thereof, or by force to prevent, hinder, or delay the execution of any law of the United States, or by force to seize, take, or possess any property of the United States contrary to the authority thereof. The elements of Count 3 are: 1) a conspiracy; 2) to knowingly provide material support or resources to a foreign terrorist organization; 3) within the United States or subject to the jurisdiction of the United States. 18 U.S.C. § 2339B. The elements of Count 4 are: 1) a conspiracy, 2) to willfully make or receive any contribution of funds, goods, or services, to or for the benefit of the Taliban. 50 U.S.C. § 1705(b); 31 C.F.R. § 545.201 *et seq.*

Contributing services to the Taliban has been prohibited since July 4, 1999, and Al–Qaeda has been designated a foreign terrorist organization since October 9, 1999. 64 Fed.Reg. 36,759; 64 Fed.Reg. 55,112.

 As we have found, the government's evidence establishes beyond a reasonable doubt that on September 16, 2001, Ali Al–Timimi urged the attendees at the meeting at Kwon's house to heed the call of Mullah Omar for all Muslims to help defend the Taliban. After the meeting, Khan heeded this advice and agreed with the three co-conspirators to travel to LET to obtain training with the object of fighting in Afghanistan. Fighting on behalf of the Taliban clearly constitutes providing services to that group. By September 16, 2001, it was clear that the fight for which Mullah Omar was bracing would be against United States forces, and that any fighting in defense of the Taliban would be against United States troops. The parties have stipulated to this fact (G Ex. 8–1), witnesses have testified that they were aware of it, and we take judicial notice of it. Although Khan never succeeded in reaching Afghanistan and therefore never actually contributed his services to the Taliban, the testimony of multiple witnesses was that after the September 16 meeting Khan intended to fight in Afghanistan, and he took concrete steps with co-conspirators to pursue that goal. This evidence establishes beyond a reasonable doubt that Khan is guilty of Counts 2 and 4.

 To be guilty of Count 3, Khan must have intended to provide material support to Al–Qaeda. The testimony of co-conspirators who attended the September 16 meeting was that Khan was heeding the call of Mullah Omar to fight on behalf of an Islamic nation established in Afghanistan. Although the parties have stipulated that the Taliban was protecting Al–Qaeda and bin Laden at that time (G. Ex. 8–1), we find no direct evidence that Khan

intended to provide material support to Al–Qaeda. Although the law prohibits "*any* contribution of funds, goods, and services, to or for the benefit of the Taliban," the law prohibiting aid to Al–Qaeda is narrower, prohibiting only "*material* support or resources" directly to that organization. 31 C.F.R. § 545.201(b) 18 U.S.C. § 2339B (emphasis added). "Material support or resources" is defined by statute as "currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials." 18 U.S.C. § 2339A. Although Khan's fighting on behalf of the Al–Qaeda's protector, the Taliban, would certainly benefit Al–Qaeda, such assistance does not fit the statutory definition of "material support or resources." Accordingly, we find Khan not guilty of Count 3.

### 3. *Count 5*

 The elements of Count 5, conspiracy to provide material support to LET, are: 1) a conspiracy; 2) to provide material support or resources or conceal or disguise the nature, location, source, or ownership of material support or resources; 3) knowing or intending that they are to be used in preparation for, or in carrying out, a violation of 18 U.S.C. § 956. Title 18 U.S.C. § 956 prohibits 1) conspiring within the United States, with one or more other persons, regardless of where such other person or persons are located; 2) to commit at any place outside the United States an act that would constitute the offense of murder, kidnaping, or maiming if committed in the special maritime and territorial jurisdiction of the United States, or to damage or destroy specific property situated within a foreign country and belonging

to a foreign government or to any political subdivision thereof with which the United States is at peace, or any railroad, canal, bridge, airport, airfield, or other public utility, public conveyance, or public structure, or any religious, educational, or cultural property so situated; 3) an overt act within the United States in furtherance of the conspiracy.

■ We find ample evidence that LET was engaged in a conspiracy under 18 U.S.C. § 956 to commit crimes of violence and damage property in India, a foreign country with which the United States was at peace. Such evidence includes the Taiba bulletins published by LET taking credit for attacks on troops and civilian targets in India, as well as the news accounts of those attacks that several co-conspirators testified that they read. We also find ample evidence that persons within the United States participated in that conspiracy, including the testimony of several witnesses that both Royer and Al-Hamdi traveled to LET camps, returned to the United States, and encouraged other conspirators to attend LET training.

Moreover, as discussed in the findings of fact above, Khan and Chapman conspired to provide, and actually provided, model airplane video and navigation equipment to LET through Singh. Such equipment fits the definition of material support cited above as both communications equipment and physical assets. The evidence also shows that the paintball leaders, including Chapman and Abdur–Raheem, conspired to provide material support to LET in the form of "personnel." Although defendants have repeatedly argued that attending an LET training camp does not constitute providing personnel to that organization under 18 U.S.C. §§ 2339A, 2339B, we do not find that argument applicable, given the facts of this case. In *Humanitarian Law Project, et al. v. U.S. Department of Justice*, 352 F.3d 382, 403–405 (9th Cir. 2003), the Ninth Circuit found the term "personnel," as used in 18 U.S.C. § 2339A, unconstitutionally vague because it could be construed to prohibit protected speech on behalf of a designated terrorist organization. To cure this objection, the Department of Justice has established a policy that a person may be prosecuted under 18 U.S.C. § 2339B if and only if that person has knowingly provided that organization with one or more individuals to work under the organization's direction or control. *See United States Attorneys' Manual* § 9–91.100. Because we read criminal statutes narrowly to avoid constitutional infirmities, *see Crowell v. Benson*, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932), we find that the statute as applied to this case does not implicate First Amendment concerns at all. The conspiracy alleged in Count 5 was not to provide "personnel" who would speak on behalf of LET, or provide moral support, or simply receive training, but to provide personnel who, after receiving training, would serve that organization as soldiers, recruiters, and procurers of supplies. Indeed, the evidence shows that the conspirators did much more than just receive training from LET—they returned to the United States, recruited co-conspirators, and purchased technology for LET to use in its attacks on India. Although there is no evidence that Abdur–Raheem participated in Chapman and Khan's technology transfers, his role in the paintball group with co-conspirators Chapman and Al–Hamdi, who did more than just train with LET, coupled with Abdur–Raheem's stated intent to help militant Muslims fighting against India, proves his participation in the conspiracy to provide material support to LET. Considering all the evidence, including Abdur–Raheem's and Chapman's lack of candor, we find beyond a reasonable doubt that Khan, Chapman, and Abdur–Raheem are guilty of Count 5.

#### 4. Count 11

 Count 11 charges Khan, Chapman, and Abdur–Raheem with conspiracy to possess and use firearms in connection with a crime of violence. The elements are: 1) a conspiracy, 2) to knowingly use, carry, possess, or discharge firearms, 3) in furtherance of a crime of violence. The predicate crimes of violence specified in the indictment include conspiracy to violate the Neutrality Act, conspiracy to provide material support to LET, conspiracy to supply services to the Taliban, conspiring to violate 18 U.S.C. § 959, conspiracy to levy war against the United States, conspiracy to provide material support to Al–Qaeda, and conspiracy to enlist and serve in armed hostility against the United States.

 There is overwhelming testimonial and documentary evidence that each defendant possessed, used, and discharged firearms, and we have already found each defendant guilty of at least one predicate crime. We find that each of these predicate crimes—conspiracies to violate the Neutrality Act, levy war against the United States, supply services to the Taliban, and provide material support to LET—are crimes of violence as defined by 18 U.S.C. § 924(c)(3). That subsection defines a crime of violence as a felony offense that "(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." The predicate crimes clearly fit within this definition.

The only remaining issue is whether the defendants conspired to use and possess these weapons in furtherance of the predicate crimes. We find evidence that each of them did. The evidence shows that both Chapman and Abdur–Raheem facilitated the acquisition of weapons by co-conspirators, both by transferring weapons among the conspirators and attesting to paperwork that documented these transfers, sometimes falsely. The testimony of several witnesses was that the conspirators selected AK–47–style weapons to familiarize themselves with the types of weapons they would use if called upon to fight overseas. This evidence is sufficient to prove beyond a reasonable doubt that both Chapman and Abdur–Raheem intended that their possession and use of weapons, and the possession and use by co-conspirators, was in furtherance of the conspiracies to violate the Neutrality Act and to provide material support to LET. For defendant Khan, we find that the agreement after the September 16 meeting to receive training at LET encompassed knowledge and intent that such training would include weapons training, and therefore Khan and his co-conspirators agreed to use weapons at the LET camp to further their conspiracy to levy war against United States forces on behalf of the Taliban. For these reasons, we find Khan, Chapman, and Abdur–Raheem guilty of Count 11.

### B. Neutrality Act Counts

 Counts 9 and 10 charge Chapman and Khan, respectively, with violating the Neutrality Act, 18 U.S.C. § 960, by traveling to LET camps. The elements of these counts are: 1) a military expedition organized in this country; 2) against the territory or dominion of any foreign prince or state, or of any colony, district, or people with whom the United States is at peace; 3) defendant provided means for the expedition in this district with knowledge of its character. The parties stipulated that the United States is now, and at all relevant times was, at peace with India (G Ex. 8–45).

Based on our findings of fact, we find insufficient evidence that either Chapman or Khan organized their trip to the LET camp as an expedition against India. Although other members of LET certainly conducted expeditions against India, and although Royer told co-conspirators that he had participated in such attacks, we do not find that Khan and Chapman participated in any operations against India, or that their intent in traveling to the LET camp was directed at waging war against India. Chapman's attendance at the camps suffices to place him in a conspiracy to violate the Neutrality Act and Khan's attendance places him in a conspiracy to supply services to the Taliban. However, the government has failed to prove beyond a reasonable doubt the second element of the substantive Neutrality Act violation as to Khan and Chapman, that is, that their expeditions from the United States to the LET camp were military expeditions against India. Therefore, we find Chapman not guilty of Count 9 and Khan not guilty of Count 10.

### C. Firearms counts

#### 1. Counts 12–14 (Receiving ammunition)

Counts 12–14 charge Abdur–Raheem with receiving ammunition in interstate commerce with cause to believe that a felony is to be committed therewith. Each count relates to a separate shipment of ammunition ordered by Abdur–Raheem. The elements of the offense are: 1) defendant shipped, transported, or received ammunition; 2) in interstate or foreign commerce; 3) with intent to commit therewith a felony, or with knowledge or reasonable cause to believe that a felony is to be committed therewith. The predicate crimes alleged include the conspiracies charged in the indictment. The evidence clearly establishes that Abdur–Raheem received ammunition in interstate commerce,

and, as discussed above, we have found Abdur–Raheem guilty of three predicate felonies. The only remaining issue is whether Abdur–Raheem had the necessary intent, i.e. whether there is a sufficient link between the receipt of ammunition and the predicate felonies.

We do not find sufficient evidence of such a link. The evidence shows that Abdur–Raheem acquired a rifle before the beginning of the conspiracy, and used this rifle for target practice, often with co-defendant Caliph Basha, against whom all charges were dismissed. The evidence also shows that the ammunition shipments charged in Counts 13 and 14 were actually sent to Caliph Basha, and were suitable for use in Caliph Basha's rifle, but not the model of rifle owned by Abdur–Raheem. The evidence also shows that some of this ammunition was stolen from Caliph Basha, and other ammunition was recovered from the home of Abdur–Raheem in March 2003. Of the ammunition that was expended, there is no evidence that the ammunition was used for anything other than Abdur–Raheem's and Caliph Basha's target shooting at the firing range, or that the ammunition was used by any co-conspirators. Based on this evidence, the government has not proved beyond a reasonable doubt that Abdur–Raheem intended to use the ammunition in relation to the predicate conspiracy felonies, and therefore we find Abdur–Raheem not guilty of Counts 12–14.

#### 2. Counts 20, 21, 31, and 32 (Possession of firearms)

Counts 20, 21, 31, and 32 charge defendants with possession of firearms in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c). Count 20 charges Chapman with possession of a Saiga .308 rifle in Fairfax, VA on December 18, 2000. Count 21 charges Chapman

with possession of an AK–47 rifle in Falls Church, VA in June 2001. Count 31 charges Abdur–Raheem with possession of an AK–47 rifle at his home in Falls Church, VA on April 1, 2003. Count 32 charges Khan with possession of an AK–47 rifle at his home in Gaithersburg, MD on May 8, 2003. The elements of a § 924(c) offense are: 1) knowing possession; 2) in furtherance of a crime of violence for which defendant may be prosecuted in a court of the United States. The predicate crimes of violence alleged are the conspiracies in the indictment, of which we have already found each defendant guilty. The evidence of possession by each defendant on the date alleged is clear. The remaining question is whether such possession was in furtherance of the predicate conspiracies.

In *Bailey v. United States,* 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), the Supreme Court held that 18 U.S.C. § 924(c), which at that time only criminalized using and carrying a firearm "during and in relation to" a crime of violence, did not reach mere contemporaneous possession of the weapon, but required some active employment of the firearm. In response, Congress amended 18 U.S.C. § 924(c) to criminalize possession "in furtherance of" a crime of violence, while retaining the prohibition on using and carrying firearms "during and in relation to" crimes of violence. Congress explained that "in furtherance of" was a higher standard than "during and in relation to," and that to convict under the possession prong rather than the using and carrying prong:

> The government must clearly show that a firearm was possessed to advance or promote the commission of the underlying offense. The mere presence of a firearm in an area where a criminal act occurs is not a sufficient basis for imposing this particular mandatory sentence. Rather, the government must illustrate through specific facts, which tie the defendant to the firearm, that the firearm was possessed to advance or promote the criminal activity.

H.R.Rep. No. 105–344. *See United States v. Lomax,* 293 F.3d 701, 704 (4th Cir.2002); *United States v. Mackey,* 265 F.3d 457, 461 (6th Cir.2001).

 In interpreting this section, courts have developed a non-exclusive list of factors to be considered in determining whether a sufficient nexus exists between possession of the weapon and the predicate offense. These factors include the type of weapon, the legality of its possession, the type of criminal activity conducted, and the time and circumstances under which the firearm was found. *See Mackey,* 265 F.3d at 462; *United States v. Wahl,* 290 F.3d 370, 376 (D.C.Cir.2002).

Count 21 charges Chapman with possession in December 2000, on the date he sold the Saiga .308 rifle to co-conspirator Ibrahim Al–Hamdi. As we discussed in our findings of fact above, Hamdi had traveled to LET in the fall of 2000, and by December 2000 we find that Chapman knew Al–Hamdi had taken this trip. During 2000 and 2001, both Chapman and Al–Hamdi were leaders in the paintball games, and the evidence shows that part of the conspiracy was to familiarize the conspirators with various weapons. Because we find that Chapman's transfer of the weapon to Al–Hamdi furthered the conspiracy to violate the Neutrality Act, by extension Chapman's possession of the weapon on that date furthered the conspiracy. Accordingly, we find Chapman guilty of Count 20.

 Count 21 charges Chapman with possession in June 2001, when he sold two AK–47 rifles before leaving for his trip to Pakistan. The evidence regarding these transactions is somewhat unclear, but it appears that in June 2001 Chapman sold one·rifle to Ahmed Abu Ali and the other

to Nader Khallifah, Nabil Gharbieh's cousin. One of these rifles was subsequently transferred to Caliph Basha. Because neither of the purchasers in June 2001 was a member of any conspiracy alleged in the indictment, we do not find a sufficient nexus between Chapman's possession of these weapons when he sold them in June 2001 and any predicate offense. Accordingly, we find Chapman not guilty of Count 21.

■ Count 31 charges Abdur–Raheem with possession of an AK–47 rifle when he was interviewed by FBI agents at his home in April 2003. He voluntarily surrendered the rifle to the agents at that time. The evidence shows that the rifle was unloaded, in a case, and in a closet of the home, and that it was legally owned. There is no evidence that Abdur–Raheem had fired the weapon after September 11, 2001. Evidence of phone calls among Abdur–Raheem, Royer, and Al–Timimi in the spring of 2003 shows that the conspiracy was still continuing at that time, and that Abdur–Raheem had not withdrawn. However, applying the factors that distinguish possession in furtherance of a crime from legal possession of a lawful weapon, we find that by 2003 the connections between the possession and the predicate conspiracy crimes had become too attenuated to establish the "furtherance" element beyond a reasonable doubt. For this reason, we find Abdur–Raheem not guilty of Count 31.

■ Count 32 against Khan suffers from the same deficiency. Khan is charged with possession of an AK–47 rifle that FBI agents seized when executing a search warrant at his home in May 2003. The weapon was found unloaded in a basement closet and was legally owned. The only relevant difference from the Abdur–Raheem possession in Count 31 was that the weapon was seized pursuant to a warrant rather than voluntarily surrendered, but we do not consider that distinction

material, because there is no evidence that Khan was given an opportunity to surrender the weapon voluntarily. For the same reasons discussed as to Count 31, we find that Khan's possession in March 2003 was not in furtherance of any predicate crime, and find Khan not guilty of Count 32.

### 3. Counts 22 and 24–27 (Use and discharge of firearms)

■ Counts 22 and 24–27 charge Chapman and Khan, respectively, with using and discharging weapons during their attendance at LET camps in Pakistan in 2001. The elements of this offense are: 1) knowing use and discharge; 2) during and in relation to a crime of violence. Among the predicate crimes of violence alleged are the conspiracies charged in the indictment. We have already found both Khan and Chapman guilty of conspiracies that included their travel to the LET camp. The remaining issues are whether the defendants did in fact use and discharge weapons during their trips, and whether such use and discharge was during and in relation to the predicate conspiracies.

■ Count 22 charges Chapman with firing an AK–47, a machine gun, and a rocket-propelled grenade in September 2001. There was no evidence presented from anyone who was present at the camp and witnessed Chapman fire these weapons. The only evidence comes from Chapman himself, who testified that he fired an AK–47, but not a machine gun or a rocket-propelled grenade. We find, therefore, that Chapman fired an AK–47 at the LET camp, but none of the other weapons charged. We further find that firing weapons at the camp was during and in relation to the conspiracies to violate the Neutrality Act and provide material support to LET. Firing weapons while at the camp was essential to the conspiracies, as this opportunity provided the conspirators

with an incentive to attend and trained them in skills that they could use in future jihad combat. For these reasons, we find that the elements of Count 22 have been satisfied beyond a reasonable doubt, and find Chapman guilty of discharging an AK–47 rifle.

 Khan is charged in four separate counts with using and discharging an AK–47 rifle (Count 24), a 12 mm anti-aircraft gun (Count 25), a machine gun (Count 26), and a rocket-propelled grenade (Count 27), all during his trip to the LET camp in September and October 2001. As discussed in our findings of fact above, we find credible and consistent the testimony of co-conspirators Hasan and Kwon, who participated in the weapons training with Khan and testified that they and Khan each fired an AK–47, an anti-aircraft gun, and a rocket-propelled grenade. For the same reasons discussed above as to Chapman, we find that firing these weapons at the LET camp was during and in relation to the predicate conspiracy crimes of violence. Accordingly, we find Khan guilty of Count 32, and that he discharged an AK–47 rifle, an anti-aircraft gun, and a rocket-propelled grenade.

## IV. Conclusion

For the above stated reasons, we find defendant Khan guilty of Counts 1, 2, 4, 5, 11, 24, 25, and 27; defendant Chapman guilty of Counts 1, 5, 11, 20, and 22, and defendant Abdur–Raheem guilty of Counts 1, 5, and 11; and find the defendants not guilty of the remaining counts. Separate judgment orders reflecting the Court's judgment as to each defendant will be issued with this Memorandum Opinion.